**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DAVERILLE SHER, and
DAVID BARCH,

      Plaintiffs,

v.

AMICA MUTUAL INSURANCE COMPANY, a Rhode Island Corporation,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

### INTRODUCTION

1.     This is an action for breach of contract, violation of C.R.S. §§ 10-3-1115/1116, and first-party bad faith arising out of Defendant's unlawful conduct when handling Plaintiffs' claim for homeowners' insurance benefits.

### PARTIES

2.     Plaintiffs Daverille Sher and David Barch ("the Insureds") are the named insureds under the relevant policy for homeowners' insurance, which was issued by Defendant Amica Mutual Insurance Company ("Amica") and identified as Policy No. 62120520VN ("the Policy"). The Policy protects the Insureds' home, which is located at 525 Peaceful Drive in Durango, Colorado ("the Home"), against direct physical loss. The Insureds are husband and wife. The

Insureds reside in the Home approximately six months out of each year. The Insureds are domiciled in the State of Arizona.

3.      Defendant Amica is a Rhode Island corporation with its principal place of business in Rhode Island. Amica is and was, at all times relevant, authorized to do business in the State of Colorado. One or more employees, representatives, or agents of Amica issued the Policy to the Insureds, received notice of water damage to the Home ("the Loss"), opened Claim No. 60004203255 ("the Claim"), undertook an initial investigation of the Claim, and subsequently denied coverage for the Loss.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Total diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2). The Home is located in this judicial district. Amica issued the Policy to the Insureds in this judicial district. The Loss occurred in this judicial district. Amica's investigation of the Loss occurred in this judicial district.

## FACTUAL ALLEGATIONS

### The Home

6.      The Home is a four-bedroom, three-bathroom, ranch-style, single-family residence. The Home is a wood-framed structure supported by cast-in-place shallow foundations with slab-on-grade interior polished concrete floors. The Home is approximately 3,000 square

feet and sits on 35 acres of land.  The Home was built in 2009.  The Insureds purchased the Home in 2017 for $1,180,000.

7.     The following is a satellite image showing an aerial view of the Home and a portion of the property on which the Home sits.  It shows a gravel driveway to the west of the Home, a hydronic solar array to the west of the driveway, and a photovoltaic array south of the hydronic solar array.  The image also shows a drainage ditch immediately west of the driveway, between the driveway and the solar arrays, extending north beyond the top of the driveway.



8.      The following is a zoomed-in view of the satellite image featured in Paragraph 7. It shows (as two gray dots) the well head and top of the underground cisterns, which are located to the south of the eastern end of the photovoltaic array.  At all times relevant, the water level of the cisterns was controlled, at least in part, by a float pump switch.



9.      The property is graded such that the driveway and abutting drainage ditch sit lower than both the solar arrays and cistern to the west and the Home to the east.  Water accumulating on the property near the Home, solar arrays, or cisterns thus flows downhill to the drainage ditch, which carries the water down the northern slope, diverting it away from the Home and surrounding area.

10.     The following is a foundation plan drawing of the Home, which identifies certain key rooms and features.



11.     The Home was designed and built to be energy efficient.  The Home features a hydronic solar array, a solar photovoltaic array, a hydronic in-floor radiant heating system ("the In-Floor Radiant System"), a Nest thermostat system, and structural insulated panels ("SIPs") on all exterior walls and ceilings.

12.     The In-Floor Radiant System is the sole heat source for the interior of the Home.  The In-Floor Radiant System features cross-linked polyethylene ("PEX") tubing embedded in the concrete slab.  The following figure illustrates how the underfloor PEX tubing is embedded in the concrete slab beneath the interior polished concrete flooring.  The interior polished concrete flooring runs throughout the Home and is covered with Marmoleum sheet flooring in only the office, kitchen, and laundry room.



13.    The In-Floor Radiant System heats the Home in the following manner: a) the solar hydronic preheat system heats water to temperature based on the Nest thermostat setting; b) water is distributed from the preheat tank to the in-slab PEX tubing via a manifold in the boiler room; and c) circulator pumps draw water into the PEX tubing and circulate it through each room of the Home before returning it back to the preheat tank, which is connected to the boiler, for reheating to temperature and redistribution through the manifold.

14.    The In-Floor Radiant System is a closed system that recirculates water through the underfloor PEX tubing. It is connected to the domestic water supply through an automatic refill valve. The refill valve is set to monitor the pressure in the In-Floor Radiant System and to add freshwater to the In-Floor Radiant System when the pressure in the In-Floor Radiant System falls below the set point on the automatic refill valve. The underfloor pressure was set at or below 30 pounds per square inch ("psi"). The domestic water system was maintained at 65 psi. The domestic water system is supplied with water from the well. The well is pressurized by a separate pump to maintain a pressure of 65 psi in the domestic water system for the Home.

15.    In order to directly observe the PEX tubing system to locate any leaks in the tubing, the concrete slab must be destroyed or substantially damaged.

16.     Thermal imaging can be used to detect heat patterns in the floor and the location of leaks in the PEX tubing without destroying the concrete slab.

### The Loss

17.     In September 2021, the Insureds retained a landscaper named Stevie Chambers ("Chambers") to perform certain exterior projects at the Home.  The Insureds expected Chambers would start her work in October 2021, after they had left Colorado for the season and returned to their home in Tucson, Arizona.

18.     On or about September 20, 2021, the Insureds turned off and shut down the Home's exterior irrigation system for the season.  The Home's exterior irrigation system has not been activated or operational since September 20, 2021.

19.     The Insureds left the Home on September 25, 2021.

20.     Plaintiff David Barch ("Barch") was scheduled to meet with, and did meet with, his spinal surgeon in Tucson, Arizona on September 27, 2021.  Barch underwent spinal surgery in Tucson, Arizona on September 29, 2021.  Both Barch and Plaintiff Daverille Sher ("Sher") remained in Tucson, Arizona for Barch's surgical recovery and post-surgical treatment.

21.     Within weeks of the Insureds' departure from the Home, Chambers observed and reported to the Insureds: a) the presence of excess water and soggy conditions on the property, especially near the exterior foundation walls of the Home; b) moss growing at the joint between the exterior patio slab and foundation wall on the north side of the Home; and c) a mushroom-like odor inside the garage and boiler room.

22.     At the Insureds' behest, Chambers immediately began efforts to try to locate the source of the excess water.

23.     On or about October 23, 2021, Chambers discovered and reported to the Insureds that the float pump switch had failed.  This failure was causing the cisterns to overflow, saturating the ground to the west of the drainage ditch and gravel driveway.

24.     At the behest of the Insureds, Chambers immediately caused the float pump switch to be replaced.  Replacement of the float pump switch remedied the overflow of the cisterns.  The cisterns have not overflowed or saturated any portion of the property with water since the float pump switch was replaced on or about October 23, 2021.

25.     On or about October 24, 2021, Chambers observed and reported to the Insureds that the conditions described in Paragraph 21 were still present.

26.     On or about October 25, 2021, Chambers entered the Home at the Insureds' behest to look for any evidence of excess water inside.

27.     Chambers observed, documented, and reported to the Insureds the following damages and conditions as of October 25, 2021: a) a damp feeling and smell inside the Home; b) efflorescence and spalling on the surface of the polished concrete floors; c) gaps between the concrete floors and certain aluminum baseboards; and d) areas of concrete flooring that felt cold to the touch.

28.     None of the damages and conditions identified in Paragraph 27 were present in the Home when the Insureds departed Colorado on September 25, 2021.

29.     Chambers advised the Insureds that she suspected the damage and conditions identified in Paragraph 27 were caused by a leak in the In-Floor Radiant System.

30.     As fully described in the Paragraphs that follow, subsequent efforts and investigation taken by or at the behest of the Insureds corroborate Chamber's initial impression that the Loss was caused by a leak in the In-Floor Radiant System.

31.     As fully described in the Paragraphs that follow, the evidence of excess water and mounting damage to the Home did not cease until the Insureds shut off the main water supply to the Home on February 4, 2022.

32.     Damage to the Home caused by a leak in the In-Floor Radiant System is covered under the Policy.

33.     Damage to the exterior and interior of the Home, as observed, reported, and/or documented by or at the behest of the Insureds constitutes a covered loss under the Policy.

### The Claim Investigation

34.     On or about October 25, 2021, the Insureds notified Amica of the suspected leak in the In-Floor Radiant System and resultant damage to the Home.

35.     On or about October 25, 2021, Amica opened the Claim.

36.     Amica delegated its investigation of the Claim to a third-party adjusting firm based in Springfield, Missouri called Acorn Claims.  Acorn Claims assigned an employee named Joe Pace ("Pace") to investigate the Claim on behalf of Amica.

37.     Amica retained and relied upon Acorn Claims and Pace to investigate the Claim on its behalf.  At all times relevant, Acorn Claims and Pace were acting as agents of Amica with respect to the Loss and the Claim.

38.     On October 29, 2021, Pace inspected the Home while Chambers was present.

39.     Upon information and belief, Pace observed and/or documented evidence of the following exterior damages and conditions on October 29, 2021: a) water, cracks, separation, shifting, and buckling of the exterior concrete patio slab; b) shifting and water inundation of the concrete brick walls and planter adjacent to the exterior concrete patio slab; and c) moss growing at the joint between the external concrete patio slab and north foundation wall of the Home.

40.     Upon information and belief, Pace observed and/or documented evidence of the following interior damages and conditions on October 29, 2021: a) water damaged concrete floors; b) separation and/or shifting of certain aluminum baseboards; c) cracks on and discoloration of certain wall surfaces; d) gaps and/or shifting around certain windows in the master bedroom and northwest guest room; e) uneven temperatures on the concrete floors; and f) a fungus-like odor inside the garage and boiler room.

41.     Upon information and belief, Pace observed and/or documented the following facts on October 29, 2021: a) a new float pump switch had been installed; b) the water level in the cisterns was normal and not overflowing; and c) the exterior irrigation system was off.

42.     On November 1, 2021, Bill Hickham, P.E., S.E. ("Hickham"), inspected the Home at the Insureds' behest.  The purpose of this inspection was to determine whether the Home had suffered any structural damage and, if so, whether such damage presented any immediate stability or life-safety issues.  Hickham inspected the home while Chambers was present.

43.     Upon information and belief, Hickham reviewed the blueprints for the Home, inspected the interior and exterior of the Home, and observed all the damages and conditions

identified in Paragraphs 39-40.  Hickham concluded these damages and conditions did not pose a structural problem or any life-safety issues.

44.     During the week of November 8, 2021, the Insureds caused certain furniture items, rugs, clothing, and other personal property contents to be removed from the Home and placed in storage.  The purpose of removing these items was to avoid and/or mitigate further water damage to the personal property contents.  Certain personal property items, including a mattress and wingtip chair, were already damaged and could not be salvaged.

45.     From November 24, 2021 – November 30, 2021, nighttime temperatures in Durango dropped below freezing.  During this time, Chambers inspected the exterior of the Home at the Insureds' behest.  Chambers observed and reported to the Insureds all of the following conditions in late November 2021: a) no snow accumulation on the exterior concrete patio slab; b) a mixture of water and ice on the exterior concrete patio slab; c) water/ice-soaked dirt around the exterior foundation wall of the north-facing bedroom; and d) moss still thriving in the area where the exterior concrete patio slab abuts the north foundation wall of the Home.

46.     On December 4, 2021, Dave Smith ("Smith") from American Leak Detection ("ALD") inspected the Home at Amica's behest.  The purpose of this inspection was to determine the cause and origin of the excess water.  Smith inspected the Home while Chambers was present.

47.     Amica retained and relied upon Smith and ALD to determine the cause and origin of the excess water.  At all times relevant, Smith and ALD were acting as agents of Amica with respect to the Loss and the Claim.

11

48.     Upon information and belief, Smith observed and reported to Amica all the following damages and conditions as of December 4, 2021: a) inundation of soils around and potentially under the Home; b) standing water on two sides of the Home; c) standing water on the exterior concrete patio slab, which was refreezing only in areas away from the foundation wall; d) heaving of the exterior concrete patio slab; e) moss growing on the exterior concrete patio slab; f) standing water in test holes drilled on the south side of the Home; g) uneven heating of the interior polished concrete flooring; and h) water damage to the interior polished concrete floors.

49.     Smith inspected the PEX tubing manifolds in the boiler room and recommended thermal imaging to identify any leaks in the In-Floor Radiant System.  Smith did not bring a thermal imager with him to the inspection.  Smith told Chambers he would return to the Home on December 5, 2021 to take thermal images of the interior concrete flooring.

50.     Before he left the Home on December 4, 2021, Smith attempted to "pressure test" the In-Floor Radiant System.  The gauge on the boiler showed the pressure of the In-Floor Radiant System was 0 psi.  Smith increased the pressure in the In-Floor Radiant System to approximately 30 psi by resetting the pressure point on the refill valve to approximately 30 psi. Smith then asked Chambers and/or the Insureds to increase the temperature on the Nest thermostat to 72 degrees Fahrenheit.  Smith advised he would recheck the pressure reading on the boiler gauge when he returned to the Home the next day.

51.     Smith returned to the Home on December 5, 2021.  Smith noted the pressure in the In-Floor Radiant System was holding at approximately 30 psi and instructed Chambers and/or the Insureds to send him photographs of the pressure gauge over the next 48 hours.

52.     Smith did not take thermal images of the interior concrete flooring on December 5, 2021.  Neither Smith nor anyone else from or on behalf of Amica _ever_ took thermal images of the interior concrete flooring to locate the leak(s) in the In-Floor Radiant System.  Smith never explained to Chambers or the Insureds why he failed to take the thermal images he recommended as advisable for determining the cause and origin of the Loss.

53.     On December 30, 2021, Smith advised Amica there was no leak in the In-Floor Radiant System.  Smith's conclusion was based solely on the fact that the In-Floor Radiant System had maintained a pressure of approximately 30 psi for 24 hours after he adjusted the pressure on the boiler.  Smith further advised Amica he could not determine the source of the continued excess water under and around the Home.

54.     Smith did not determine the cause and origin of the Loss.  Smith advised Amica the continued excess water _might_ be due to "condensation coming from the roof each morning."

55.     There is no evidence that the excess water in, under, and/or around the Home originated from roof runoff.  That the portion of the roof above exterior concrete patio slab drains to the east (not north) side of the Home.

56.     There is no evidence that the excess water in, under, and/or around the Home originated from any natural source.  There is no known free subsurface water on the property.

57.     The outcome of Smith's "pressure test" does not prove or otherwise establish there was no leak in the In-Floor Radiant System.  It proves only that water was not rushing out of the PEX tubing at a rate that outpaced the capacity of the well pump to maintain the pressure of the domestic water supply at 65 psi.

58.     Smith never decreased the pressure of the In-Floor Radiant System or instructed Chambers and/or the Insureds to decrease the pressure of the In-Floor Radiant System. Accordingly, the In-Floor Radiant System continued to be filled with water, and leak water, after Smith concluded his work.  Upon information and belief, the result of Smith's "pressure test" was increased humidity levels in the Home, which exacerbated the damage to the Home.

59.     Following Smith's "pressure test," Chambers and/or the Insureds observed and reported to Amica all the following conditions: a) the master bedroom (northeast corner of the House) and guest bedroom (northwest corner of Home) were colder than other rooms; b) there were cold spots on the floors throughout the Home; and c) the exterior concrete patio slab and brick walls around the exterior concrete patio slab continued to shift.

60.     Beginning on December 13, 2021, the Insureds caused the exterior patio slab and adjacent brick walls to be demolished and removed.  Once the exterior concrete patio slab was removed, Chambers observed and reported to the Insureds the presence of all the following conditions where the slab had been: a) saturated soils at the bottom of a previously drilled 4.5' test hole; b) a visible line of whiteish soil running parallel along the north wall of the Home; and c) a line of demarcation between thawed soils along the foundation wall and frozen soils in the remainder of the area underneath the removed patio slab.

61.     On or about December 16, 2021, Chambers purchased a thermal imager at the Insureds' behest.

62.     From December 16, 2021 – December 18, 2021, Chambers took thermal images of the concrete flooring inside the Home while the In-Floor Radiant System was operating.

63.     Upon information and belief, the thermal images taken by Chambers show an uneven heat distribution underneath the concrete flooring. Upon information and belief, certain areas of uneven heating matched cold spots on the floor, which showed signs of water damage.

64.     Beginning on December 17, 2021, the In-Floor Radiant System was no longer maintaining the interior temperature of the Home set by the Nest thermostat. At the Insureds' behest, Chambers purchased and placed inside the Home seven portable electric space heaters.

65.     On December 22, 2021, the Insureds caused to be completed all the following actions: a) the electric power to the radiant heat boiler at the breaker box was shut down; b) the In-Floor Radiant System circulation pumps were shut off at the pump controller box; and c) the Nest thermostat system was deactivated. The Insureds took these actions to avoid and/or mitigate additional water damage to the Home caused by one or more leaks in the In-Floor Radiant System.

66.     On January 9, 2022, the Insureds caused a 3.5' test hole to be dug along the north foundation wall of the Home. Despite freezing temperatures and winter conditions, the soil at the bottom of the test hole was thawed and wet.

67.     On January 9, 2022, the Insureds caused a portion of the vapor barrier along the north foundation wall of the Home to be uncovered. That portion of the north foundation wall underneath the removed vapor barrier was wet.

68.     On January 9, 2022, the Insureds caused the In-Floor Radiant System to be disconnected from the domestic water supply. The Insureds did so to avoid and/or mitigate additional water damage to the Home caused by one or more leaks in the In-Floor Radiant System.

69.     On January 10, 2022, Bill Cain ("Cain") of Animas Valley Services ("AVS") visited the Home at the Insureds' behest.  The purpose of this visit was: to perform a complete diagnostic inspection of the boiler, heating system, and In-Floor Radiant System; to observe and assess the cause of the water leaking from the northside of the foundation; to review the thermal images of the interior floors; and to further assess any issues with the In-Floor Radiant System.

70.     Upon information and belief, Cain observed all the following damages and conditions on January 10, 2022: a) water damage to the polished concrete floors in the hallways, bedrooms, and living room; b) efflorescence on certain aluminum baseboards; c) gaps and shifting to or of the interior walls along the polished concrete floors and stem walls; d) cracks and discoloration on or of the interior drywall overlaying certain SIPs; e) shifted bathroom shower tile seams; f) thawed, warm soil in the bottom of the 3.5' test hole along the north foundation wall; g) water seeping from inside the foundation; h) thermal imaging showing an uneven heat distribution on the concrete flooring; and i) a pressure gauge reading of 15 psi for the In-Floor Radiant System.

71.     Based on the observations listed in Paragraph 70, Cain concluded the excess water and damage to the Home was caused by one or more leaks in the In-Floor Radiant System.  Cain recommended the Insureds replace the entire In-Floor Radiant System.  The Insureds notified Amica immediately of Cain's findings and recommendation.

72.     On January 26, 2022, Pace again visited the Home while Chambers was present.  Pace noted the differing conclusions of Smith and Cain.  Like Smith, Pace concluded he was unable to determine the cause and origin of the Loss.

73.     On January 26, 2022, an Amica desk adjuster named Robert Ormsby ("Ormsby") wrote to the Insureds.  Ormsby said in pertinent part: "There appears to be at least three possible sources for the excess water[:] (1) the overflowing cistern, (2) leaking from irrigation lines[,] and (3) leaking from the in-floor radiant heating system.  Currently, it is unclear if there is a leak in the radiant heating system and whether these three issues are independent of each other or connected.  Additional investigation is necessary in order to determine coverage under your policy."  Ormsby advised Amica would retain an engineer to determine causation.

74.     Amica knew, when it wrote to the Insureds on January 26, 2022, that two of the three "possible sources for the excess water" identified in Ormsby's letter could be reasonably ruled out.  Specifically, as of January 26, 2022, Amica knew all the following: a) the irrigation system had been shut off and inoperable since September 20, 2021; b) the Insureds replaced the well float pump switch on or about October 23, 2021; c) the cistern had not overflowed since the well float pump switch was replaced; d) the cistern is located west of the Home on the other side of the depressed gravel driveway and drainage ditch; and e) water does not naturally flow uphill.

75.     On February 1, 2022, Anthony Garcia ("Garcia") of A&E Plumbing visited the Home at the Insureds' behest.  The purpose of this visit was to shut off all sources of water to the interior of the Home to avoid and/or mitigate additional water damage to the Home caused by one or more leaks in the In-Floor Radiant System.

76.     Over the next four days, Garcia: a) drained all the water from the solar water heating system and In-Floor Radiant System; b) drained the Glycol solution from the outdoor solar array and the recirculating pump and loop in the boiler room; c) disconnected and removed

the solar water heating system and In-Floor Radiant System; and d) shut off the master water valve to the Home.

77.     The master water valve has remained off and no water has run into the Home from the domestic water supply since February 4, 2022.

78.     From February 4, 2022 – February 6, 2022, Chambers and/or the Insureds observed and documented all the following damages and conditions: a) additional shifting of the interior walls and windows of the Home; b) discoloration, warping, and delamination of the kitchen cabinets; c) extensive moisture, odorous vapor, and mold damage to the kitchen cabinets, counter tops, appliances, and contents of cabinets; d) lifting of the Marmoleum sheet flooring in the kitchen; e) water trapped under the Marmoleum sheet flooring in the kitchen; and f) a musty odor from the kitchen cabinets, appliances, and office.

79.     On February 7, 2022, the Insureds asked Pace to conduct a third site inspection so he could see these damages identified in Paragraph 78 first-hand and discuss with them both the causal conclusions of Cain and AVS and the fact that the Home had incurred significant additional interior damage since Smith increased in the pressure on the boiler on December 4, 2021.

80.     On February 8, 2022, Chambers observed even further damage, including: a) lifting of the Marmoleum sheet flooring in the office and laundry room; and b) water trapped under the Marmoleum sheet flooring in the office and laundry room.

81.     On February 12, 2022, Pace again visited the Home.  Upon information and belief, Pace observed and/or documented all the damages and conditions identified at Paragraphs 78 and 80 while he was at the Home on February 12, 2022.

82.     On February 12, 2022, the Insureds advised Pace that Smith had exacerbated the interior damages to the Home by dramatically increasing humidity levels when he increased the boiler pressure and instructed them to increase the temperature demand of the In-Floor Radiant System.  Pace responded that Smith's actions "were neither here nor there."  Pace advised he would prepare and submit to Amica a report of his findings.  Neither Pace nor anyone from Amica shared the contents or conclusions of Pace's February 12th report with the Insureds.

83.     Following Pace's third inspection of the Home, the Insureds commenced efforts to remove damaged items from the Home, including certain: a) damaged aluminum baseboards; b) damaged Marmoleum floor coverings; and c) damaged drywall covering the SIPS panels.

84.     On February 15, 2022, Scott Simmons, P.E. ("Simmons") and Michael Cook ("Cook") of Rimkus Consulting Group, Inc. ("Rimkus") inspected the Home at Amica's behest. The purpose of that inspection was to determine the cause and origin of the water leak and whether the damage to the Home was caused by the leak.  Chambers was present during the Rimkus inspection.

85.     Amica retained and relied upon Simmons, Cook, and Rimkus to determine the cause and origin of the excess water, as well as the scope and extent of the water damage to the Home.  At all times relevant, Simmons, Cook, and Rimkus were acting as agents of Amica with respect to the Loss and the Claim.

86.     On March 18, 2022, Rimkus issued a report of its findings ("the Rimkus Report").

87.     The Rimkus Report acknowledges: a) water from underneath the concrete flooring can enter the Home by traveling through the flooring and evaporating into the air; b) any water that travels through the concrete flooring and evaporates into the air will increase the

humidity levels within the Home; and c) if water from a reported leak in the In-Floor Radiant System had evaporated into the air and caused elevated humidity levels with the residence, widespread delamination of materials and staining on the gypsum board would be expected.

88.     The Rimkus Report states: a) on October 25, 2021, the Insureds reported that water entering the residence from a failed in-slab radiant heat system had caused interior damage to the Home; b) thermal images taken by the Insureds reportedly show uneven heat distributions on the concrete flooring; c) Cain inspected the heating systems and determined the excess water was caused by a leak in the In-Floor Radiant System; and d) the Insureds reported damage to the interior of the Home, including discoloration and separation of the kitchen cabinets, discoloration and spotting of the kitchen counter, discoloration and staining of the gypsum wall board in the great room, peeling and buckling of certain laminate veneers, water trapped under the kitchen and laundry room Marmoleum flooring, and a musty odor present in the trapped water and other areas of the Home.

89.     Still, the Rimkus Report concludes: a) there is insufficient data to determine the source of the leak or that a leak occurred; b) there is no evidence that the water damage originated from the In-Floor Radiant System; and c) all the damage to the Home was caused by something other than excess water, such as shrinkage, thermal movements, improper installation, and/or manufacturing defects.

90.     The Rimkus Report faults the Insureds for creating a purported lack of data by shutting off the water to the Home and removing damaged elements from the Home.  The Rimkus Report fails to acknowledge that: a) Simmons and Cook did not inspect the Home until approximately four months after Amica opened the Claim; b) Amica had, thorough its

representatives and agents, inspected the Home four times before Simmons and Cook conducted their site inspection; c) the damage to the Home was well-documented through reports and photographic evidence; d) although Smith recommended that thermal images of the concrete flooring be taken while the In-Floor Radiant System was operational, neither Smith nor Amica actually took thermal images during the course of the cause and origin investigation; and e) the Insureds have a duty under the Policy to mitigate their damages through reasonable remediation and repair efforts.

91.     The Rimkus Report ignores all the evidence available to Amica that one or more leaks occurred in the In-Floor Radiant System.  Such evidence includes, but is not limited to: a) the reports of Chambers and the Insureds; b) the causation conclusion of Smith and AVS; c) the presence of standing water trapped underneath the Marmoleum sheet flooring in every room in which it was installed (the kitchen, office, and laundry room); d) the presence of moisture trapped behind the vapor barrier wrapped around the foundation walls; e) the uneven heat distribution and cold spots on the polished concrete flooring; f) the increased humidity levels in the Home following Smith's "pressure test"; g) the widespread delamination, peeling, buckling, and discoloration of materials inside the Home; h) effloresce and spalling of the concrete floors; i) the presence of warm, wet soils by the north foundation wall of the Home in winter; j) the presence of fungi and standing water on the exterior patio slab in winter; k) the shifting and heaving of the exterior concrete patio slab and associated brick walls; l) the fact that the In-Floor Radiant System failed to maintain temperatures in the Home as of December 17, 2021; and m) the fact that the excess water in, under, and around the Home did not begin to recede until the main water supply was shut off and disconnected on February 4, 2022.

92.     The Rimkus Report provides no explanation for how all the damage to the Home could be caused by something other than water when the damage to the Home did not predate the Loss and everyone who visited and/or inspected the Home following the Loss recognized that excess water had been in, under, and around the Home since October 2021.  Rimkus' conclusion that shrinkage, movement, improper installation, and manufacturing defects all suddenly and simultaneously caused damage to the Home – independent of the excess water in, under, and around the Home – is facially absurd.

## Amica's Denial of Coverage and Benefits Owed

93.     On March 30, 2022, Ormsby again wrote to the Insureds, informing them of Amica's formal coverage position.  At that time, Ormsby again acknowledged the presence of excess water on the property and the fact that the Home had sustained water damage.  At that time, Ormsby reaffirmed Amica's position that the damage to the Home was caused by three potential sources: a) an overflowing cistern; b) leaks in the exterior irrigation lines; or c) leaks in the In-Floor Radiant System.  Then, in complete reliance on the Rimkus Report and willful disregard of all other evidence provided by the Insureds, Ormsby wrote: "[T]here is no factual evidence [] to support there was a leak in the radiant floor heating system and if there was, there is no support that it caused any damage."  Finally, Ormsby conceded: "There is also no evidence to suggest that the overflowing of the cistern or sprinkler system damaged the dwelling either."

94.     On March 30, 2022, Ormsby told the Insureds that Amica had no obligation to pay benefits on the Claim because "a number of policy exclusions apply" to the Loss.  According to Amica, the Loss is excluded from coverage under one or more of these Policy exclusions: a) freezing, thawing, pressure or weight of water or ice to a patio, foundation, wall, or any structure

that supports all or part of a building; b) constant or repeated seepage or leakage of water over a period of time unless the same is unknown to the insureds and hidden within the floors; c) wear and tear, marring, or deterioration; d) latent defect or inherent vice; e) settling or shrinking and any resultant cracking to pavement, patios, foundations, or floors; f) earth movement; g) water that backs up through sewers or drains; h) water that overflows or is otherwise discharged from a sump or sump pump; i) ground water; and j) faulty of defective design, specifications, workmanship, construction, or construction materials. Ormsby made no effort in his March 30th letter to explain which Policy exclusions apply to which portions of the Loss or why.

95.     On March 30, 2022, Ormsby invited the Insureds to present additional information if they disagreed with Amica's coverage position.

### Post-Denial Actions

96.     On May 3, 2022, LandEx Earthworks ("LandEx") carried out a cause and origin inquiry at the Insureds' behest. On that date, LandEx Crews excavated three test areas where water had pooled to expose the concrete stem wall and footing. Crews peeled back the vapor barrier from the foundation wall to expose the raw concrete. Crews observed and documented significant water behind the vapor barrier. LandEx Earthworks determined this water originated from inside the foundation and was due to a leak in the In-Floor Radiant System.

97.     On May 24, 2022, the Insureds wrote to Amica through counsel. At that time, the Insureds "vehemently disagree[ed] with Amica's coverage position," stated the reasons why the Loss is covered under the terms of the Policy, and presented even more evidence that the damage to the Home was caused by excess water originating from the In-Floor Radiant System. Such

evidence includes the formal report of LandEx's findings and conclusions and a video taken by LandEx crews during their investigation and excavation work done at the Home.

98.     The Insureds asked Amica to consider these new materials, reverse its coverage position, and complete its investigation of the Claim and evaluation of the Loss within 30 days. The Insureds asked that if Amica refused to reverse its coverage position, that it "articulate in writing each and every reason for that decision and identify with specificity which of the 'numerous policy exclusions' Amica asserts actually applies to this loss and why."

99.     On June 22, 2022, Amica reaffirmed its denial of coverage for the Loss.

100.    To date, Amica has refused to pay any benefits owed on the Claim, identify which Policy exclusion(s) apply to which portions of the Loss, and explain why such exclusion(s) negate coverage under the circumstances.

101.    To date, remediation efforts and necessary repairs are ongoing at the Home.

102.    To date, the Insureds have spent over $400,000 investigating the cause and origin of the excess water on the property, undertaking remediation efforts, and beginning the necessary repairs.

103.    Upon information and belief, the total cost to repair the dwelling will exceed $1,000,000.

104.    The Insureds remain displaced from the Home due to the water damage and ongoing remediation efforts and repairs.

105.    At all times relevant, the Insureds paid all premiums owed under the Policy and otherwise met or substantially complied with their duties under the Policy.

106.    The Insureds are entitled to benefits under the Policy arising from the Loss under Coverages A (dwelling), C (personal property), and D (loss of use / additional living expenses).

107.    Amica has repudiated the Policy and otherwise failed to meet its obligations under the Policy.

108.    Amica's failure to meet its Policy obligations is ongoing.

109.    Amica's failure to meet its Policy obligations has directly and proximately caused the Insureds to suffer injuries, damages, and losses.

110.    Absent an Order or Judgment from this Court, Amica's failure to meet its Policy obligations will continue to directly and proximately cause the Insureds to suffer injuries, damages, and losses.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

111.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs with specificity as if fully set forth herein.

112.    At all times relevant, the Policy was a valid and enforceable contract.

113.    In exchange for the payment of premiums, the Policy obligates Amica to pay the Insureds insurance benefits, subject to the terms and conditions of the Policy.

114.    The Insureds timely paid all premiums owed under the Policy and otherwise met or substantially complied with their duties under the Policy.

115.    Amica breached the contract for insurance by: a) wrongfully applying one or more exclusions to the Loss; b) denying coverage for the Loss; and c) failing to pay benefits owed under the Policy.

116. As a direct and proximate result of Amica's breaches of contract, the Insureds have suffered economic damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
## (Violation of C.R.S. §§ 10-3-1115 and -1116)

117. Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs with specificity as if fully set forth herein.

118. C.R.S. § 10-3-1115 and -1116 prohibit a person engaged in the business of insurance from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of any first-party claimant.

119. Amica is a person engaged in the business of insurance in Colorado.

120. The Insureds are first-party claimants under Section 10-3-1115(1)(b)(I) and the Policy.

121. The Loss was a covered occurrence under the Policy.

122. Amica unreasonably delayed and/or denied the payment of insurance benefits owed under the Policy relating to the Loss.

123. There is no reasonable justification for Amica's delay or denial of benefits.

124. Amica's unreasonable delay and/or denial of benefits violates C.R.S. §§ 10-3-1115 and -1116.

125. As a direct and proximate result of Amica's statutory violations, the Insureds have suffered injuries, damages, and losses.

126. Pursuant to C.R.S. § 10-3-1116, the Insureds are entitled to recover reasonable attorneys' fees, costs, and two times the covered benefit unreasonably delayed and/or denied by Amica.

## THIRD CLAIM FOR RELIEF
### (First-Party Bad Faith)

127.    Plaintiffs incorporate by reference the allegations contained in all preceding

paragraphs with specificity as if fully set forth herein.

128.    Amica owed to the Insureds certain duties in accordance with the implied

covenant of good faith and fair dealing.

129.    Amica breached its duty of good faith and fair dealing by engaging in, without

limitation, the following unreasonable acts: a) failing to extend coverage for the Loss; b) failing

to articulate which Policy exclusion(s) apply to the Loss; c) failing to meet its burden of

establishing that one or more Policy exclusions apply to the Loss under the circumstances; d)

willfully ignoring available information supporting coverage; e) failing to conduct a reasonable

investigation of the Claim; f) failing to conduct a reasonable evaluation of the Loss; g) requiring

more of the Insureds than is required under the Policy to establish coverage and/or an entitlement

to benefits; h) impermissibly shifting the burden and cost of investigating the Claim and/or

evaluating the Loss onto the Insureds; i) failing to give the Insureds the benefit of the doubt

when and/or if it was faced with conflicting information; j) refusing to use all available

investigative tools to corroborate the causation conclusion of Cain and AVS; k) using the

"hidden nature" of the leak(s) in the In-Floor Radiant System against the Insureds; l) taking,

causing, and/or sanctioning actions that exacerbated the Loss and increased the Insureds'

damages; m) ignoring communications from the Insureds that it had taken, caused, and/or

sanctioned actions that exacerbated the Loss and increased the Insureds' damages; n) placing its

own interests above those of the Insureds; o) not attempting in good faith to effectuate a prompt,

fair, and equitable settlement of the Claim; p) forcing the Insureds to incur the cost of contractors

and an attorney in an attempt to establish coverage and/or recover benefits under the Policy; q) forcing the Insureds to institute litigation in order to recover amounts owed under the Policy; and r) engaging in other conduct otherwise prohibited by C.R.S. § 10-3-1104(1)(h).

130.    Amica knew or recklessly disregarded the fact that the actions described in Paragraph 129 were unreasonable.

131.    As a result of Amica's bad faith conduct, the Insureds have suffered economic and non-economic damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Daverille Sher and David Barch respectfully request this Court enter judgment in their favor and against Defendant Amica Mutual Insurance Company for all the damages they sustained as a result of Defendant's unlawful actions and omissions, as described herein, including:

(A)    economic damages equal to the amount of benefits owed under the Policy;

(B)    economic damages equal to the amount the Insureds paid out-of-pocket to investigate the cause and origin of the Loss and present their Claim;

(C)    statutory penalties equal to two-times the covered benefit unreasonably delayed or denied;

(D)    reasonable attorneys' fees and costs as authorized by C.R.S. § 10-3-1116;

(E)    non-economic damages in an amount to compensate Plaintiffs for the emotional and financial stress, worry, and inconvenience caused by Amica's bad faith conduct;

(F)    pre- and post-judgment interest as allowed by law; and

(G)    any other such relief as this Court deems just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**


Respectfully submitted this 22nd day of September, 2022.


                                         HAILEY | HART PLLC

By:    *s/ Melissa A. Hailey*
        Melissa A. Hailey, CO Reg. 42836
        Elizabeth A. Hart, CO Reg. 46041
        383 Corona Street, Suite 319
        Denver, CO 80218
        720-400-7970
        melissa@haileyhartlaw.com
        liz@haileyhartlaw.com