# EXHIBIT 9

Rimkus Consulting Group, Inc.
8100 S. Akron Street, Suite 320
Centennial, CO 80112
Telephone: (720) 488-8710

# Supplemental Report of Findings

**Sher Damage Evaluation**
**Claim No: 60004203255**

**Rimkus Matter No: 100157415**

**Prepared For:**

**Amica Insurance Company**
**25 Amica Way**
**Lincoln, RI 02865**

**Attention:**

**Mr. Rob Ormsby**

COLORADO LICENSED SCOTT J. SIMMONS 53881 PROFESSIONAL ENGINEER

Scott Simmons Digitally signed by: Scott Simmons DN: CN = Scott Simmons C = US O = Colorado Date: 2022.06.17 15:15:37 -07'00'

**Scott J. Simmons, P.E.**
**Engineering Number 53881**
**Consultant**

COLORADO LICENSED JOHN W. BITTNER 53955 PROFESSIONAL ENGINEER

John Bittner Digitally signed by: John Bittner DN: CN = John Bittner C = US O = Colorado Date: 2022.06.17 15:12:20 -07'00'

**John Bittner, P.E.**
**Engineering Number 53955**
**Senior Consultant**

June 17, 2022

## TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Conclusions | 2 |
| III. | Discussion | 4 |
| | • Review and Response to Letter | |
| IV. | Basis of Report | 18 |
| V. | Attachments | 19 |
| | A. Curricula Vitae | |

# Section I
# INTRODUCTION

On October 25, 2021, Ms. Daverille Sher (the Owner) reported that water entered into the interior of the Owner's residence from a failed in-slab radiant heat system, which had caused structural damage to the concrete slabs and damaged the interior of the residence. The Owner's residence was located at 525 Peaceful Drive in Durango, Colorado.

Rimkus Consulting Group, Inc. (Rimkus) was retained to visually inspect the residence and determine the cause and origin of the reported water leak. It was also requested to determine if the reported damage was caused by the reported water leak. Scott J. Simmons, P.E., Consultant, and Mr. Michael E. Cook, Consultant, under the direct supervision of Mr. John W. Bittner, Senior Consultant, inspected the residence on February 15, 2022. Pursuant to this request, Rimkus issued a **Report of Findings** dated March 18, 2022 (the Rimkus Report).

Subsequently, Rimkus was asked to review additional documents and materials provided by Hailey Hart, PLLC (Hailey). This **Supplemental Report of Findings** is submitted responsive to this latest request and incorporates the full context and **Basis of Report** contained in the **Report of Findings** and should not be considered a stand-alone document. A technical review of this report was performed by Mr. Paul G. Phillips, Senior Practice Leader, and Mr. Christopher A. Hasse, Practice Leader.

This report was prepared for the exclusive use of Amica Insurance Company and was not intended for any other purpose. Our report was based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

## Section II
## CONCLUSIONS

Rimkus reaffirms its mechanical conclusions as stated in the Rimkus Report and are shown for reference below. The additional information provided did not change our conclusions or require supplemental conclusions.

1. Based on the provided reports and available photographs, there was no evidence that the reported damage originated from a failed pipe in the radiant floor heating system.
2. The removal and replacement of the radiant system components in the mechanical room were not required or necessary.
3. At the time of the Rimkus inspection, there was no active water leak and the irrigation piping was removed. There was insufficient data to determine the source(s) of the leaks or to verify that leaks occurred.

Rimkus reaffirms its structural and non-structural damage conclusions as stated in the Rimkus Report and are shown for reference below. The additional information provided did not change our conclusions or require supplemental conclusions.

4. There was no evidence of damage to the structural elements of the residence by the reported leak.
5. Conclusions regarding the non-structural items that were reported as damaged by the leak are as follows:
   a. The exterior concrete patio slab had been removed from the residence by the Owner's contractor, and therefore, Rimkus could not opine on damage to it.
   b. The cracks in the exterior stucco were caused by shrinkage and thermal movements and were not caused by the reported leak.

c. The interior concrete floor or foundation walls were not structurally damaged. The cracks in the floor slab along the front entrance hallway were caused by shrinkage of the concrete following placement.

d. Gaps between the interior finishes and the windows were not caused by the reported leak but were common installation gaps that were not filled with sealant.

e. There was no evidence of damage to the baseboards caused by the reported leak.

f. The Marmoleum floor coverings had been removed from the residence by the Owner's contractor, and therefore, Rimkus could not opine on damage to them.

g. Isolated cracks in the corners of the gypsum walls were caused by normal movements of the residence and not by the reported water leak.

h. There was no evidence that the discolorations on interior wall surfaces were caused by the reported water leak.

i. There was no evidence of damage to the wood ceiling panels.

j. The delaminating veneer of the Bedroom #2 door was not caused by the reported water leak.

k. The coloration of the countertop was original to the manufacturing process and was not caused by the reported water leak.

# Section III
# DISCUSSION

**Review and Response to Hailey Letter Dated May 24, 2022, and Exhibits**

Rimkus was provided a 13-page letter signed by Melissa A. Hailey, Esq. with exhibits by Landex, apparently a contractor hired by the insured. Among the exhibits were several IR images that Rimkus had received prior to the **Report of Findings**, as well as more photographs of damage taken by others prior to the Rimkus inspection. In addition, there was a Landex video which depicted the outside foundation membrane being pulled back by a worker with moisture underneath, as well as a Landex letter dated May 3, 2022.

Assertions and information in the letter are shown below in italics, followed by Rimkus' response, and are divided into mechanical and structural/non-structural damage sections.

<u>Mechanical</u>

*Mr. Smith's conclusions regarding the in-floor heating system is unfounded. Because of the pressure of the in-floor heating system is controlled by the refill valve, the pressure in the system would drop only if the leak was so significant that the amount of water rushing out of the in-floor system was greater than the amount of water that could be fed back into the system by the well pump. Thus, the fact that the pressure held at 30 psi is no <u>dispositive</u>* <u>[sic]</u> *to the issue. To be sure, this pressure testing method would detect only leaks in the system that outpaced the well pump [page 6]*

**Rimkus Response:**

The conclusions stated in Mr. Smith's report are those of American Leak Detection. While not entirely clear of the exact steps Mr. Smith took to make his determination, his report included photographs and reasoning behind his conclusion. It is normal practice when pressure testing water piping, whether domestic water or hydronic, to close off makeup water to test it. There is no indication that the refill valve was

left open. Rimkus has not been provided any additional evidence or information that would lead us to change the mechanical conclusions in the **Report of Findings**. There was no evidence of a leak in the radiant system.

At the time of Rimkus involvement, the mechanical components driving the in-floor heating system had been completely removed. This was entirely unnecessary, regardless of if a leak was present or not. The heating equipment would not need to be removed or replaced even if there had been a leak in the in-floor piping. As another example, one would not replace a water heater to find a leak in the upstream piping. One would locate the leak and repair it.

The Landex letter (Exhibit A) stated: *Landex Earthworks carried out a systematic formal inquiry to discover and examine the facts as to why and how water was permeating from the foundation of the structure causing significant pooling of water on and near the exterior of the house surface and foundation. Crews excavated three test areas where water was pooling to expose the concrete stem wall and footing. Significant water had been coming from the inside of the foundation was found to be the problem.*

**Rimkus Response:**

The radiant heating system had been completely shut down beginning on February 1, 2022. Additionally, incoming water was entirely cutoff from entering the residence since this same time period. The fact that moisture and pools of water were still being discovered at the time of this report in May 2022 provides further evidence that the in-floor heating system was not the source of the water causing the reported damage.

Throughout Ms. Hailey's letter, it referenced the thermal images taken of the interior flooring on December 16 and 17, 2021. While uneven heat distribution is not desirable and could indicate a problem such as a leak or blockage, it is not proof of an active leak in the system. As stated in the Rimkus **Report of Findings**, the provided thermal images are misleading and speculative. While the aim or

"target" on the image provides a surface temperature reading, the images do not provide a corresponding temperature scale for different colors. In other words, the blue/green portions which were deemed as "cold spots", do not show the temperature difference compared to the red/yellow areas and are not evidence of a leaking in-floor heating system. Ms. Hailey referenced the website https://hti-instrument.com/blogs/news/underfloor-heating-diagnostic-with-thermal-camera as a basis for thermal imaging of problematic radiant heat systems. **Figure 1** below was taken directly from the article, which shows a very clear thermal image of in-floor piping. There is a temperature scale on the right side, maximum/minimum temperatures, and a clear image of the laid out piping below the flooring. This is a good example of a useful thermal image.



**Figure 1 –** Snip Image from HTI-Instrument website.

If extreme cold spots are occurring in the radiant floor system, it does not necessarily mean a leak is the root cause. Groundwater saturation could cause the slab to become cold and tax the radiant system in specific areas, which would result in cold spots.

Regardless, the provided blurry thermal images showing varying colors on the floor does not provide any evidence of a leak.

Structural/Nonstructural Damage

*On or about October 23, 2021, the insureds discovered the well float pump switch had failed. Such failure was causing the two cisterns on the property to overflow, saturating the ground to the west of the drainage ditch at the west edge of the gravel driveway. The float pump switch was immediately replaced, and the cistern overflow issue was accordingly resolved.*

*On or about October 25, 2021, the insureds observed and documented evidence of water damage inside the home. They reported the damage to Amica, which in turn, opened the above referenced claim. Amica assigned Joe Pace of Acorn Claims to help investigate the loss. [Page 3]*

**Rimkus Response:**

The timing of the overflowing cistern and the identification of water damage is a strong indication that the two events were related. It was unknown how long the cistern had been overflowing and would have likely saturated the soil around the foundations of the Residence.

*On November 1, 2021, Bill Hickham, P.E., S.E., inspected the residence at the insureds' request. The purpose of this inspection was to determine whether the residence had suffered any structural damage and, if so, if such damage presented any immediate stability or life-safety issues. Mr. Hickham reviewed the blueprints, inspected the interior and exterior of the home, and observed all the damages* [sic] *and conditions identified above. Mr. Hickham determined these damages* [sic] *and conditions did not pose a structural problem. [Page 4]*

**Rimkus Response:**

Rimkus concurs that there was no structural damage to the Residence as stated in the Rimkus Conclusions.

*From November 24 – November 30, 2021, nighttime temperatures in Durango dropped below freezing. The insureds inspected the property during this time and observed a mixture of water and ice on the patio slab, water/ice-soaked dirt around the exterior foundation wall of the north-facing bedroom, and moss still thriving in the area where the patio slab abuts the north foundation wall. [Page 4]*

**Rimkus Response:**

According to Weather Underground historical information, approximately 1/4 inch of rain fell in Durango on November 24, 2021. It is typical for nighttime temperatures to be below freezing and daytime temperatures to be above freezing at this time. The weather information also showed that was the case. Moss on the north side of a building is also common. Moss growth may have been exacerbated by the recent cistern overflow.

*On February 1, 2022, Anthony Garcia of A&E Plumbing visited the home at the insureds' request. The purpose of his visit was to shut off all sources of water to the interior of the home. Over the next four days, Mr. Garcia drained all water from the solar heating systems, preheat tanks, and in-floor PEX tubing. He also drained the Glycol solution from the outdoor solar arrays and the recirculating pump and loop in the boiler room. He then disconnected and removed the solar heating systems and shut off the master water valve to the home. The master water valve has remained off – and thus no water has been run into the home – since February 4, 2022 [Page 7].*

**Rimkus Response:**

If all of the water had been turned off and drained from the heating system since February 4, 2022, it would be unlikely that this would be a source of water around foundations in May 2022.

*From February 4 – 6, 2022, the insureds observed and documented all the following:*

- *additional shifting of the interior walls and windows;*
- *discoloration, warping, and delamination of the kitchen cabinets;*
- *extensive moisture, odorous vapor, and mold damage to the kitchen cabinets, countertops, appliances, and contents of cabinets;*
- *lifting of the Marmoleum sheet flooring in the kitchen;*
- *water trapped under the Marmoleum sheet flooring in the kitchen; and*
- *a musty odor from the kitchen cabinets, appliances, and office.*

*Certain photographs of the interior damage are provided with this letter as Ex. C.*

*On February 7, 2022, the insureds requested Mr. Pace conduct another site inspection so he could see these damage first-hand and discuss with them both the causal conclusion of Animas Valley Services and the fact that the home had suffered significant additional interior damage since Mr. Smith increased in the pressure on the radiant heat boiler on December 4, 2021.*

*On February 8, 2022, the insureds observed even further damage, including:*

- *lifting of the Marmoleum sheet flooring in the office and laundry room; and*
- *water trapped under the Marmoleum sheet flooring in the office and laundry room.*

**Rimkus Response:**

Rimkus found no evidence of shifting interior walls and windows and that was also supported by the assessment of Mr. Bill Hickam previously mentioned. Rimkus

also determined that the countertops were not damaged by moisture. There is no reasonable explanation of how a reported leak in the flooring would cause damage to a solid countertop meant to be exposed to water. The flooring and kitchen cabinet faces had been removed by the insured's contractor prior to our inspection and could not be observed or verified. In undertaking a renovation project prior to the inspection, the insured destroyed potential evidence that could support their claim. Rimkus did not note a musty odor during their inspection.

*The Rimkus Report acknowledges:*

• *on October 25, 2021, the insureds reported that water entering the residence from a failed in-slab radiant heat system had caused interior damage to the home;*

• *thermal images taken by the insureds show uneven heat distributions on the concrete flooring;*

• *Mr. Cain of Animas Valley Services inspected the heating systems and determined the excess water was caused by a leak in the in-floor heating system;*

• *the insureds had shut off all water to the interior and exterior of the home, and removed major elements from the home, including the exterior patio slab and adjacent brick walls, the aluminum baseboards, certain Marmoleum floor coverings, all drywall covering the SIPs panels, and all systems connected to the in-floor heating system;*

• *the kitchen cabinets were discolored and separating;*

• *the kitchen counter was discolored and spotted;*

• *the gypsum wall board in the great room was stained and discolored;*

• *certain laminate veneers were peeling and buckled;*

• *water was trapped under the kitchen and laundry room flooring; and*

*• the trapped water had a musty odor, which was also present in other areas of the house.*

*Still, the Rimkus Report concludes:*

*• there is insufficient data to determine the source of the leak or that a leak occurred;*

*• there is no evidence that the water damage originated from a failed pipe in the radiant floor heating system; and*

*• all the damage to the home was caused by something other than excess water, such as shrinkage, thermal movements, improper installation, and/or manufacturing defects.*

*Rimkus' conclusions are factually incorrect, unsupported, and illogical. [Page 9].*

**Rimkus Response:**

Rimkus did not acknowledge any claim or alleged damage in their report as the report merely restates information reported by the insured in the interview, presents observations and analyzes the evidence available during the Inspection. Hailey misrepresented the information given by the insured as observations by Rimkus. The kitchen cabinet faces had been removed prior to the inspection and we did not find any separating cabinetry, Rimkus found that the counters had not been stained or discolored. There was also no plausible connection between an under-slab water source and a waterproof countertop surface. The gypsum wall board on one wall in the great room was discolored, but there was no plausible connection between that and an under-slab leak that was reportedly affecting the entire Residence. Discolorations on walls can have many causes including sun exposure, local heat and moisture sources, or candles or an incense burner. There was no discoloration on other walls, the oriented strand board baseboards next to the floors, or the exposed SIPS panel faces which would have been expected for a condition affecting the entire residence. Hailey provided no explanation for these

observations that related to a reported under-slab leak. There was one of many doors that had a peeling laminate veneer. A local water or vapor source would cause such peeling, but the absence of peeling on the other doors indicated it was not a condition affecting the entire Residence. Again, because the insured's contractor had removed most of the potentially corroborating evidence, there was no connection between a reported under-slab leak and delamination on one of many doors. Rimkus did not observe musty odors or water and the flooring, amongst other finishes, had been removed prior to our inspection. Rimkus' conclusions are correct, supported, and logical. Hailey's assertions are not.

*Rimkus' conclusion that all the exterior and interior damage was caused by something other than water is also disconcerting. This conclusion ignores that fact that none of the observed and documented damage was present prior to October 2021, and assumes that multiple causes of damage (shrinkage, movement, improper installation, and manufacturing defects) all occurred and/or manifested simultaneously yet independently of one another suddenly and without warning at the insured residence. Moreover, this conclusion ignores numerous material facts, known to both Rimkus and Amica, including but not limited to the following:*

- *excess water was observed and documented around and under the foundation walls;*
- *excess water was trapped underneath the Marmoleum floors;*
- *the humidity levels in the home were unnaturally high for Durango in winter;*
- *the humidity level was increased dramatically on and after December 4, 2021, when Mr. Smith visited the home on behalf of Amica, increased the pressure of the in-floor heating boiler some 30-fold, and instructed the insureds to increase and maintain the temperature demands of the system; and*
- *the documented interior conditions, including but not limited to, delamination and buckling of doors, separating and discoloration of cabinets and countertops, and*

*discoloration/staining of gypsum wall board are evidence of "widespread delamination of materials and staining on the gypsum board," which are clearly consistent with high humidity levels, i.e., water damage. [Page 10].*

**Rimkus Response:**

Rimkus Conclusions are stated at the beginning of this report. Rimkus did not conclude that there was no damage from water. Rimkus gave specific conclusions for each item of damage that was reported by the insured that we could observe. As previously stated, the insured removed many of the finishes prior to the Rimkus inspection, but what remained did not indicate damage from a reported leak in radiant floor system. Much of the mechanical system had been removed and deactivated, as well. Excess water vapor could be caused by a malfunctioning or improperly set humidification system, as well. Rimkus cannot evaluate what Rimkus cannot observe. Rimkus reviewed photos provided by the insured to Rimkus before the report was written and photos provided with this letter. The photos did not have any narrative or reference points/locations to evaluate. It is not clear in many what is being shown as damage. To Rimkus' knowledge, there were no photos of the finishes provided prior to the reported under-slab leak to compare to the photos afterward. Excess water was not observed during the Rimkus inspection around the Residence. No water was observed in the Residence during the Rimkus inspection, and the flooring had been removed. Rimkus does not know of documented humidity levels as stated; however, the humidity and moisture contents inside the Residence during our inspection were normal.

*LandEx Earthworks carried out a systematic and formal inquiry to discover why and how water was pooling around the foundation of the insured residence. Crews excavated three test areas where water was pooling to expose the concrete stem wall and footing. Crews then peeled back the waterproof membrane from the foundation wall to expose the raw concrete. Crews observed and documented significant water behind the waterproof*

*membrane. LandEx Earthworks determined this water originated from inside the foundation and is pooling under and around the foundation. LandEx Earthworks determined the water permeating from inside the foundation was due to a leak in the in-floor heating system. [Page 12]*

**Rimkus Response:**

A review of LandEx's website indicated that they were an excavation contractor. Their own description on their website states the following:

> "LandEx Earthworks LLC is a fully licensed, bonded, and insured company offering multiple earthwork and complete site development services including excavation, grading, septic system installation, utilities, demolition, roads and driveways, land clearing/fire mitigation, and property enhancement for homeowners, government agencies, and other professional contractors throughout Southwestern Colorado and Arizona.
>
> LandEx does not, by their own definition, have expertise in forensics to undertake a systematic and formal inquiry to make a determination of the cause of the reported leak or the extent of damage and necessary repair. The excavations they undertook damaged previously undamaged components around the Residence and were unnecessary. Abraham Maslow wrote in 1966, "If the only tool you have is a hammer, it is tempting to treat everything as if it were a nail". If you hire an excavator to investigate, they will dig up your foundation. While it is interesting that they reported water behind the foundation membrane, that does not mean it was caused by radiant flooring leaks."

*In order to fix the water damage LandEx crews excavated the entire foundation down to the footing, removed damaged waterproof membrane, removed saturated soils, exterior landscaping and concrete walkways, patios, and driveway were demolished to allow for heavy equipment access to carry out repairs. New waterproof material was applied after*

*allowing concrete to dry out adequately. An inspection was carried out by a geotechnical engineering company to eliminate the possibility of ground water from a natural spring source and to inspect the foundation for additional damages, etc.. prior to new foundation drain installation, foundation insulation, new flashing, and backfill and compaction. New concrete and landscaping will be completed. (Exhibit A Page 1)*

**Rimkus Response:**

Rimkus concurs that water inside the membrane could indicate moisture behind the foundation. In general moisture behind the foundation will migrate downward through the soil via gravity and not push through the foundation wall. If there was moisture behind the foundation it may have also been from elevated groundwater levels when the cistern was overflowing or a plumbing leak unrelated to the radiant flooring. Repeated insistence that the water behind the foundation was caused by a leak in the radiant heating system does not make it correct. While the radiant flooring may have leaked, that still has not been determined. That's why LandEx is not a forensic engineering firm. LandEx indicated that they had a geotechnical engineer inspect to eliminate the possibility of groundwater; however, no documentation from the engineer was provided and it was not apparent if the Engineer (or LandEx) knew the cistern had overflowed.

Rimkus reviewed photos attached to Exhibit A. The photos showed areas around the foundation and included photos of a wet footing. One of the photos showed an area around the foundation with snow falling and moisture on the walls and ground around the foundation (**Figure 2**).



**Figure 2 –** LandEx photo of moisture around the foundation

**Rimkus Response:**

This photo shows precipitation occurring at the time of the photo which would cause moisture on the ground. There was also moisture on the walls of the Residence. The grading around the foundation also appears to be flat and not sloping away from the foundation which would lead to moisture at the foundations. There also appears to be no waterproofing membrane on the foundation at this location.

Rimkus reviewed a LandEx video that was included as part of Exhibit A. The video showed a person peeling back the foundation membrane to show what was behind it. The person taking the video wiped his hand along the footing to show water on the footing. There was a garage door above a portion of the foundation wall.

**Rimkus Response:**

Whenever undertaking destructive testing as part of an investigation, it is normal protocol to invite all parties to the destructive testing to ensure that all perspectives and testing controls are considered. In this case, the video appeared to show the foundation was wet under the garage door, but when it was pulled back, there was dry soil on the footing under the recently peeled back membrane. As this is a snapshot of a location, it was not clear what conditions the rest of the foundations had. It is possible that water was entering the membrane at the top between the driveway slab and garage.