**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 22-cv-02470-NYW-NRN

DAVERILLE SHER, and
DAVID BARCH,

      Plaintiffs,

v.

AMICA MUTUAL INSURANCE COMPANY,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

      This is an insurance coverage dispute arising out of flooding on the property of Plaintiffs Daverille Sher and David Barch (collectively, "Plaintiffs") in Durango, Colorado, causing damage to their home and its contents.  Plaintiffs' insurer, Defendant Amica Mutual Insurance Company ("Defendant" or "Amica"), denied Plaintiffs' insurance claim, and Plaintiffs have filed suit to recover, among other relief, the insurance benefits to which they claim they are owed.

      The core issues in this case concern the source of the excess water and whether or not Plaintiffs' home and its contents were, in fact, damaged.  Thus, in their Motion for Partial Summary Judgment RE: Coverage ("Motion for Partial Summary Judgment" or "Motion"), [Doc. 48],[1] which is before the Court today, Plaintiffs seek to limit the issues for

---

[1] This Court uses the convention [Doc. ___] to refer to the docket number assigned by the District of Colorado's Electronic Case Filing ("ECF") system and utilizes the page number assigned by the ECF system, except in cases of citing a transcript or where original paragraph numbers are available.  In citing a transcript, the Court refers to the

trial to these questions of causation and damage, requesting that this Court declare, as a matter of law, that their insurance policy with Amica (the "Policy") provides coverage for any direct physical damage to their residence and personal property contained therein that was damaged by water that overflowed the cisterns on the property or leaked from the outdoor irrigation lines or in-floor radiant heat system, notwithstanding a policy exclusion for acts of vandalism.

For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment will be **GRANTED**.   In addition, Defendant's Motion to Amend Answer ("Motion to Amend") [Doc. 61] is respectfully **DENIED**.

## PROCEDURAL BACKGROUND

Plaintiffs initiated this action in September 2022 by filing a Complaint and Jury Demand, [Doc. 1],[2] in the United States District Court for the District of Colorado.  Plaintiffs assert claims for breach of contract, unreasonable delay and/or denial of insurance benefits in violation of Colo. Rev. Stat. §§ 10-3-1115 and 10-3-1116, and common law bad faith arising from an insurance claim involving water intrusion that allegedly caused damage to Plaintiffs' home located in in Durango, Colorado.  [Doc. 25 at ¶¶ 117–138]. They seek the benefits to which they claim they are owed under the Policy; their out-of-pocket expenses related to their investigation of the cause and origin of the excess water; statutory penalties equal to two-times the covered benefit unreasonably delayed and/or

---

original page and line number, and in cases where original paragraph numbers are available, the Court cites to paragraph number.

[2] Plaintiffs have since filed a First Amended Complaint and Jury Demand ("Amended Complaint"), [Doc. 25].

denied; attorneys' fees and costs as authorized by Colo. Rev. Stat. § 10-3-1116; noneconomic damages; and pre- and post-judgment interest.  [*Id.* at 30–31].

Specifically, Plaintiffs claim that the following physical damages to the interior of the home were caused by "water intrusion and resultant elevated moisture and humidity levels":

> discoloration, marking, and/or staining of concrete floors; gaps between aluminum baseboards and floor; corrosion of sill bolts; saturation, lifting, delamination, and separation of Marmoleum sheet flooring; loosening, shifting, and/or lifting of bathroom tiles; discoloration, warping, peeling, and/or delamination of wood laminate veneers on cabinetry, built-in appliances, the centerpiece fireplace, and interior doors; discoloration, cracking, and crumbling of plaster walls and ceilings; and dampness / mustiness of honeycomb window shades.

[Doc. 48 at ¶ 47 (citing [Doc. 48-16 at 9–10])].  Additionally, Plaintiffs assert that "certain hardscaped surfaces adjacent to the Home cracked, shifted, heaved, and buckled due to saturated soils."  [*Id.* at ¶ 49 (citing [Doc. 48-16 at 11])].  Plaintiffs also assert that "certain personal property contents were rendered unsalvageable due to water intrusion and resultant elevated moisture and humidly levels." [*Id.* at ¶ 48 (citing [Doc. 48-16 at 10])].  Finally, Plaintiffs claim they have spent more than $1,300,000.00 to date investigating the cause of loss, remediating the water damage, making the necessary repairs, and replacing the affected personal property contents.  [*Id.* at ¶ 50 (citing [Doc. 48-17 at 10–12])].

Defendant asserts there was no direct physical loss to their home (the "Home") or its contents. [*Id.* at ¶ 53; Doc. 58 at ¶ 53].  But if the Home or its contents did sustain some direct physical loss, Amica asserts, such loss is subject to one or more Policy exclusions, including exclusions for loss caused by subsurface and surface water and wear and tear. [Doc. 48 at ¶ 54; Doc. 60 at ¶ 54].  Additionally, Defendant claims that, although no

specific cause of the excess water has been conclusively identified, any water damage to the Home and its contents may have been caused by an intentional act of Stephanie Chambers ("Ms. Chambers"), a landscaper hired by Plaintiffs. [Doc. 48 at ¶ 55; Doc. 60 at ¶ 55].

The Honorable N. Reid Neureiter entered a Scheduling Order in this case on January 4, 2023, which established January 20, 2023, as the deadline to join parties and amend pleadings. [Doc. 17 at 14]. Judge Neureiter then extended the deadline to amend pleadings to February 6, 2023. [Doc. 24]. After discovery closed on June 30, 2023, *see* [*id.*], Plaintiffs filed the instant Motion for Partial Summary Judgment, [Doc. 48]. Defendant has filed a Response to Plaintiffs' Motion for Partial Summary Judgment ("Response"), [Doc. 58; Doc. 60], to which Plaintiffs have replied, [Doc. 59]. In addition, on January 23, 2024, Amica filed a Motion to Amend, seeking to add an affirmative defense of fraud. [Doc. 61]. Plaintiffs filed their Response to the Motion to Amend on February 13, 2024, [Doc. 62], and Defendant replied on March 5, 2024, [Doc. 65].

Accordingly, these matters are fully briefed and ripe for this Court's review.

## LEGAL STANDARDS

### I.    Motion for Partial Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing a lack of genuine fact disputes, and, in response, the nonmovant must set forth specific facts demonstrating that a genuine issue exists. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is

essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).  In resolving a motion for summary judgment, the court reviews the evidence in the light most favorable to the nonmoving party, *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998), and must refrain from weighing evidence or making credibility determinations, *see Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).

## II.    Motion to Amend

When a party seeks amendment of a pleading after the deadline set in a scheduling order, the Court's analysis is subject to two considerations.  *See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014).  The movant must establish good cause for seeking a modification of the scheduling deadline under Rule 16(b)(4) of the Federal Rules of Civil Procedure.  *Id.*  The determination of good cause lies within the sound discretion of the court. Fed. R. Civ. P. 16(b)(4); *Gorsuch*, 771 F.3d at 1242 (observing that the decision to deny a motion to amend the scheduling order was within the district court's discretion).  The inquiry under Rule 16 focuses on the diligence of the party seeking leave to amend; the movant establishes good cause when it demonstrates that it could not have met the deadline as set in the Scheduling Order despite its best efforts. *Pumpco, Inc. v. Shenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) ("Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party.  Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." (quotation omitted)).  A party's delay in performing the pretrial preparation necessary to recognize a claim or defense does not satisfy Rule 16(b)(4)'s good cause standard. *See, e.g.*, *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 688 (D. Colo. 2000).  The party seeking an extension is

normally expected to show at least good faith on its part and some reasonable basis for not meeting the deadline. *Deghand v. Wal-Mart Stores, Inc.*, 904 F. Supp. 1218, 1221 (D. Kan. 1995).

To merit amendment, a party must also satisfy the requirements for amendment under Rule 15(a). *Pumpco, Inc.*, 204 F.R.D. at 668. In contrast to Rule 16(b)(4), Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The court may refuse leave to amend, however, upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). A general presumption exists in favor of allowing a party to amend its pleadings, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and the non-moving party bears the burden of showing that the proposed amendment is improper, *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv. Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).

Whether to allow amendment is within the trial court's discretion. *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978–79 (10th Cir. 1996). To that end, if a party fails to establish good cause under Rule 16, the Court need not reach the issue of whether amendment is proper under Rule 15(a) of the Federal Rules of Civil Procedure. *Gorsuch*, 771 F.3d at 1242.

With these standards in mind, the Court turns first to Plaintiffs' Motion for Partial Summary Judgment, and then to Defendant's Motion to Amend.

**ANALYSIS**

I.     **Motion for Partial Summary Judgment**

A.     **Undisputed Material Facts**

The below material facts are drawn from the Parties' briefing and the record before the Court and are undisputed unless otherwise noted.

1.     Plaintiffs are a married couple who typically spend summers at their home in Durango, Colorado (the "Home"), and winters at another residence they own in Tucson, Arizona.  [Doc. 48 at ¶ 15; Doc. 58 at ¶ 15; Doc. 48-3 at ¶¶ 2–5].

2.     At all times relevant, Plaintiffs were insured under an insurance policy with Amica.  [Doc. 48 at ¶ 1; Doc. 58 at ¶ 1; Doc. 48-2 at 22:15–23:20].

3.     The Policy is an all-risk policy, meaning it covers any direct physical loss that is not specifically carved out from coverage.  [Doc. 48 at ¶ 2; Doc. 58 at ¶ 2; Doc. 48-2 at 25:11–25].

4.     The Home is insured under the Policy up to a limit of $1,301,000.00.  [Doc. 48 at ¶ 3; Doc. 58 at ¶ 3; Doc. 48-1 at 20, 26].

5.     Personal property owned or used by Plaintiffs is insured under the Policy up to a limit of $975,750.00.  [Doc. 48 at ¶ 4; Doc. 58 at ¶ 4; Doc. 48-1 at 20, 26].

6.     The Policy provides that "[Defendant] insure[s] against direct physical loss to property."  [Doc. 48 at ¶ 5; Doc. 58 at ¶ 5; Doc. 48-1 at 33].

7.     Nevertheless, the Policy states that Defendant does not insure for loss "caused directly or indirectly by . . . surface water . . . [or w]ater below the surface of the ground. . . ."  [Doc. 48 at ¶ 6; Doc. 58 at ¶ 6; Doc. 48-1 at 33, 35].

8.     Nor, pursuant to the Policy, does Defendant insure for loss to the Home "[c]aused by vandalism and malicious mischief, and any ensuing loss caused by any

7

intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss."  [Doc. 48 at ¶ 5; Doc. 58 at ¶ 5; Doc. 48-1 at 33–34].

   9.  Finally, the Policy states that Defendant does not insure for loss caused by:

> Mold, fungus or wet rot.  However, [Defendant] do[es] insure for loss caused by mold, fungus or wet rot that is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure if such loss results from the accidental discharge or overflow of water . . . from within . . . [a] plumbing . . . system . . .; [or]
>
> Wear and tear, marring, deterioration[.]

[Doc. 48 at ¶ 5; Doc. 58 at ¶ 5; Doc. 48-1 at 33].

   10.  The Policy, however, sets out an exception to these the "mold, fungus, and wet rot" and "wear and tear" exclusions:

> Unless the loss is otherwise excluded, we cover loss to property . . . resulting from an accidental discharge or overflow of water . . . from within a . . . [p]lumbing . . . system [where], [f]or purposes of this provision, a plumbing system . . . does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

[Doc. 48 at ¶ 7; Doc. 58 at ¶ 7; Doc. 48-1 at 33–34].  The Policy explains that "[the surface water and subsurface water exclusions] do not apply to loss by water covered under [the mold, fungus, and wet rot and wear and tear exclusions] above."  [Doc. 48 at ¶ 7; Doc. 58 at ¶ 7; Doc. 48-1 at 33–34].

   11.  Additionally, as to the mold, fungus, and wet rot and wear and tear exclusions, the Policy provides that "any ensuing loss to the property . . . not precluded by any other provision in this policy is covered."  [Doc. 48 at ¶ 7; Doc. 58 at ¶ 7; Doc. 48-1 at 33–34].

12.     The Home is a single-story slab-on-grade structure, which sits on approximately 35 acres of land.  [Doc. 48 at ¶ 8; Doc. 58 at ¶ 8; Doc. 48-3 at ¶ 7].

13.     All water for the Home comes from a private well on the property.  [Doc. 48 at ¶ 9; Doc. 58 at ¶ 9; Doc. 48-3 at ¶ 8].

14.     A pump in the well pumps water from the well into an underground cistern when the float switch in the cistern indicates the water level in the cistern is low.  [Doc. 48 at ¶ 10; Doc. 58 at ¶ 10; Doc. 48-3 at ¶¶ 9, 12–14].

15.     When the Home requires water, a pump in the cistern pumps water from the cistern into the Home's boiler room via underground piping.  [Doc. 48 at ¶ 11; Doc. 58 at ¶ 11; Doc. 48-3 at ¶¶ 15–17].

16.     When the Home requires heat, water is pumped from the boiler room through the in-floor hydronic heating system.  [Doc. 48 at ¶ 12; Doc. 58 at ¶ 12; Doc. 48-3 at ¶ 18].

17.     When the landscaping surrounding the Home requires water, water is pumped from the boiler room through the outdoor irrigation lines.  [Doc. 48 at ¶ 13; Doc. 58 at ¶ 13; Doc. 48-3 at ¶ 19].

18.     The cistern, in-floor hydronic heating system, and outdoor irrigation lines are all part of the Home's plumbing system.  [Doc. 48 at ¶ 14; Doc. 58 at ¶ 14; Doc. 48-3 at ¶¶ 20–22].

19.     Plaintiffs left the Home for the winter season on September 25, 2021.  [Doc. 48 at ¶ 16; Doc. 58 at ¶ 16; Doc. 48-3 at ¶ 6].

20.     Prior to departing, Plaintiffs hired Ms. Chambers, a landscaper, to do some trim work and outdoor clean up.  [Doc. 48 at ¶ 17; Doc. 58 at ¶ 17; Doc. 48-3 at ¶ 23].

21.     Ms. Chambers started her work in October 2021, and thereafter advised Plaintiffs that the float switch on the cistern had failed causing the cistern to overflow. [Doc. 48 at ¶ 18; Doc. 58 at ¶ 18; Doc. 48-3 at ¶¶ 24–25].

22.     Ms. Chambers advised Plaintiffs there were unnaturally wet conditions on the property and water/moisture intrusion inside the Home.  [Doc. 48 at ¶ 19; Doc. 58 at ¶ 19; Doc. 48-3 at ¶¶ 24–27].

23.     On October 26, 2021, Plaintiffs reported to Defendant a water loss at the Home, possibly due to a float valve problem on the well/cistern.  [Doc. 48 at ¶ 20; Doc. 58 at ¶ 20; Doc. 48-2 at 34:8–36:7; Doc. 48-4 at 68–69].

24.     That same day, Defendant opened a claim for the loss ("the Claim") and commenced an investigation.  [Doc. 48 at ¶ 21; Doc. 58 at ¶ 21; Doc. 25 at ¶¶ 3, 35; Doc. 26 at ¶¶ 3, 35]; *cf.* [Doc. 48-5 at 1].

25.     On October 29, 2021, an independent adjuster ("Independent Adjuster")[3] hired by Defendant inspected the Home while Ms. Chambers was present.  [Doc. 48 at ¶ 22; Doc. 58 at ¶ 22; Doc. 25 at ¶¶ 36, 38; Doc. 26 at ¶¶ 36, 38; Doc. 48-5 at 1].

26.     At that time, Ms. Chambers expressed concern there could be a leak in the in-floor hydronic heating system.  [Doc. 48 at ¶ 23; Doc. 58 at ¶ 23; Doc. 48-2 at 102:1–15, 104:9–13].

---

[3] Although Defendant denies that this independent adjuster "took part in . . . handling the claim," Amica admits that it described the entity that conducted the inspection as an "independent adjuste[r] in the claim notes."  [Doc. 58 at ¶ 22].  Accordingly, for simplicity's sake and because it does not affect the resolution of Plaintiffs' Motion, the Court refers to this entity as an independent adjuster without concluding that the entity "took part in handling [Plaintiffs'] claim."

27.     On November 4, 2021, the Independent Adjuster advised Defendant it could not determine the cause of loss.  [Doc. 48 at ¶ 24; Doc. 58 at ¶ 24; Doc. 48-2 at 104:9–22; Doc. 48-4 at 67; Doc. 48-5 at 2].

28.     On November 8, 2021, Plaintiffs told Defendant there was a leak in the outdoor irrigation lines.  [Doc. 48 at ¶ 25; Doc. 58 at ¶ 25; Doc. 48-3 at ¶ 28; Doc. 48-4 at 66].

29.     On November 29, 2021, Defendant retained a leak detection company called American Leak Detection ("ALD") to inspect the Home and identify any plumbing leaks.  [Doc. 48 at ¶ 26; Doc. 58 at ¶ 26; Doc. 48-2 at 119:11–120:23; Doc. 48-4 at 62]; *cf.* [Doc. 48-2 at 120:24–25].

30.     On December 4, 2021, ALD inspected the Home.  [Doc. 48 at ¶ 27; Doc. 58 at ¶ 27; Doc. 25 at ¶ 49; Doc. 26 at ¶ 49].

31.     ALD observed and documented standing water and excess moisture around the Home and water damage inside and outside the Home.  [Doc. 48 at ¶ 28; Doc. 58 at ¶ 28; Doc. 48-6 at 31:9–22, 32:19–33:9, 36:24–38:6, 38:16–22, 39:7–14, 67:1–10, 67:20–23, 69:2–70:16, 124:17–20; Doc. 48-7 at 3].

32.     ALD ruled out a leak in the in-floor hydronic heating system but noted the overflow of the cistern and leaking irrigation lines could have been to blame:

> The soil around the house likely remained very damp due to the extensive drip line system of the irrigation system.  This gave the soil very little capacity to absorb the water that came down the hill from the cistern overfilling.  The water travelled from the cistern down to the house primarily underground.  Because the cistern is uphill, there is a delayed appearance of all the water that was lost from the cistern.

[Doc. 48 at ¶ 29; Doc. 58 at ¶ 29; Doc. 48-7 at 4].

33.     On January 3, 2022, Defendant forwarded the ALD Report to the Independent Adjuster and asked him to "write an estimate of damage he fe[lt] could [have] be[en] related to the worn or faulty float controller" in the cistern.  [Doc. 48 at ¶ 30; Doc. 58 at ¶ 30; Doc. 48-2 at 136:11–139:24; Doc. 48-8 at 2].

34.     On January 26, 2022, Defendant sent Plaintiffs a Reservation of Rights ("ROR") Letter, stating the excess water seemed to be coming from the cistern that overflowed, a leak in the irrigation lines, and/or a leak in the in-floor hydronic heating loops, but that Amica was not prepared to extend coverage for the loss.  [Doc. 48 at ¶ 31; Doc. 58 at ¶ 31; Doc. 48-2 at 150:25–151:2; Doc. 48-9 at 3].

35.     When Amica wrote the ROR Letter, it knew there was excess water in, under, and around the Home and interpreted the Policy to cover water damage caused by an overflow of the cistern, a leak in the irrigation lines, or a leak in the in-floor heating loops.  [Doc. 48 at ¶ 32; Doc. 58 at ¶ 32; Doc. 48-2 at 33:16–22, 92:7–13, 106:4–23, 110:23–111:4, 179:8–180:14, 227:12–228:13; Doc. 48-4 at 54].

36.     Defendant then hired two engineers from Rimkus Consulting Group ("Rimkus") to "visually inspect the [Home] and determine the cause and origin of the reported water leak."  [Doc. 48 at ¶ 33; Doc. 58 at ¶ 33; Doc. 48-2 at 195:6–16; Doc. 48-10 at 4].

37.     On February 15, 2022, Rimkus inspected the Home.  [Doc. 48 at ¶ 34; Doc. 58 at ¶ 34; Doc. 48-2 at 195:17–19; Doc. 48-10 at 4].

38.     By the time Rimkus was sent to the Home, Plaintiffs had turned off all water, dug up leaking irrigation lines, disconnected the in-floor hydronic heating system, and

begun demolition efforts.  [Doc. 48 at ¶ 35; Doc. 58 at ¶ 35; Doc. 48-2 at 230:10–25, 252:24–253:10; Doc. 48-10 at 17–18].

39.     On March 18, 2022, Rimkus reported there was "insufficient data to determine the source(s) of the leaks or to verify that leaks occurred."  [Doc. 48 at ¶ 36; Doc. 58 at ¶ 36; Doc. 48-10 at 5].

40.     Although Rimkus effectively ruled out a leak in the in-floor hydronic heating loops and irrigation lines in March 2022, it offered no opinion regarding whether the overflowing cistern may have caused the loss.  [Doc. 48 at ¶ 37; Doc. 58 at ¶ 37]; *see generally* [Doc. 48-10].

41.     On March 30, 2022, Defendant denied the Claim for a purported lack of coverage.  [Doc. 48 at ¶ 38; Doc. 58 at ¶ 38; Doc. 48-2 at 269:24–270:7; Doc. 48-11].

42.     Defendant's coverage denial letter references Rimkus's Report, [Doc. 48 at ¶ 39; Doc. 58 at ¶ 39; Doc. 48-11 at 2], and concludes that "there is no factual evidence . . . to support there was a leak in the radiant floor heating system" or "to suggest that the overflowing of the cistern or the sprinkler system damaged the [Home] either," [Doc. 48 at ¶ 39; Doc. 58 at ¶ 39 ("Defendant submits that the denial letter speaks for itself."); Doc. 48-11 at 7].

43.     On May 24, 2022, Plaintiffs asked Amica to reconsider its denial.  [Doc. 48 at ¶ 40; Doc. 58 at ¶ 40; Doc. 48-12; Doc. 48-13].

44.     Plaintiffs' reevaluation request was accompanied by a report, photos, and a video generated by LandEx Earthworks ("LandEx"), an excavation company hired by them to expose the foundation wall and pull back the vapor barrier.  [Doc. 48 at ¶ 41; Doc. 58 at ¶ 41; Doc. 48-2 at 291:3–292:10; Doc. 48-13 at 16–21].

45.     The LandEx materials show the presence of water behind the vapor barrier, indicating that water was seeping out from inside the foundation walls.  [Doc. 48 at ¶ 42; Doc. 58 at ¶ 42; Doc. 48-2 at 292:11–21; Doc. 48-13 at 16–21].

46.     Defendant sent Plaintiffs' reevaluation request to Rimkus, which then issued a Supplemental Report, stating:

> Rimkus concurs that water inside the membrane could indicate moisture behind the foundation.  In general moisture behind the foundation will migrate downward through the soil via gravity and not push through the foundation wall.  If there was moisture behind the foundation it may have also been from elevated groundwater levels when the cistern was overflowing or a plumbing leak unrelated to the radiant flooring.

[Doc. 48 at ¶ 43; Doc. 58 at ¶ 43; Doc. 48-2 at 292:22–293:3, 293:20–294:10; Doc. 48-14 at 18].

47.     This supplement clarifies Rimkus had not concluded there was no water damage to the Home and that "[t]he timing of the overflowing cistern and the identification of water damage is a strong indication that the two events were related."  [Doc. 48 at ¶ 44; Doc. 58 at ¶ 44; Doc. 48-14 at 10, 16].

48.     On June 22, 2022, Defendant forwarded Rimkus's Supplemental Report to Plaintiffs and reaffirmed its coverage denial based on the same.  [Doc. 48 at ¶ 45; Doc. 58 at ¶ 45; Doc. 48-2 at 307:11–308:22; Doc. 48-15].

49.     On September 6, 2022, two engineers hired by Plaintiffs inspected the Home in order to determine the nature and cause of loss.  [Doc. 48 at ¶ 51; Doc. 58 at ¶ 51; Doc. 48-18 at 4–5; Doc. 48-19 at 7–18].

50.     In April 2023, Plaintiffs' engineers determined that, in their opinion, the Home was damaged by water that overflowed the cistern, accumulated underneath the

Home, and then permeated the slab-on-grade foundation.  [Doc. 48 at ¶ 52; Doc. 58 at ¶ 52; Doc. 48-19 at 1, 18–28, 34–36].

51.     After Ms. Chambers discovered the excess water issue, Plaintiffs hired her to perform water mitigation and remediation work.  [Doc. 58 at 4 ¶ 1; Doc. 59 at 4 ¶ 1; Doc. 58-1 at 5].

52.     At some point before February 2022, Ms. Chambers and her team dug up all the irrigation lines at the property and turned off all the exterior water sources.  [Doc. 58 at 4; Doc. 59 at 4; Doc. 58-1 at 5]; *see also supra* ¶¶ 37–38.

53.     At some point before February 2022, Ms. Chambers and her team shut down and disconnected the in-floor radiant heat system.  [Doc. 58 at 4 ¶ 3; Doc. 59 at 4 ¶ 3; Doc. 58-1 at 5]; *see also supra* ¶¶ 37–38.

54.     Ms. Chambers discarded the Plaintiffs' personal property that was allegedly damaged.  [Doc. 58 at 5 ¶ 4; Doc. 59 at 4 ¶ 4; Doc. 58-1 at 6]; *see also supra* ¶¶ 37–38.

55.     Ms. Chambers and her team performed demolition work on the home, which began at some point before February 2022.  [Doc. 58 at 5 ¶ 5; Doc. 59 at 4 ¶ 5; Doc. 58-1 at 6–7]; *see also supra* ¶¶ 37–38.

**B.     Application**

All Parties agree that genuine factual disputes exist as to whether the Home and its contents sustained direct physical damage as contemplated by the Policy, and as to the source of the excess water on Plaintiffs' property.  *See* [Doc. 48 at 12; Doc. 58 at 5]. In order to limit the issues to be resolved at trial, Plaintiffs ask this Court to declare, as a matter of law, that if they can prove the Home and its contents were damaged by water that overflowed the cistern or leaked from the outdoor irrigations lines or in-floor hydronic

heating loops, the damage would constitute direct physical loss covered by the Policy, notwithstanding the Policy's coverage exclusion for acts of vandalism.  [Doc. 48].

First, as Plaintiffs explain, the Policy insures against "direct physical loss" to the Home and its contents.  [*Id.* at 14]; *supra* ¶¶ 3–5.  Plaintiffs contend that, although it is not defined by the Policy, the phrase "direct physical loss" contemplates an "immediate and perceptible destruction or deprivation of property."  *Sagome, Inc. v. Cincinnati Ins. Co.*, 56 F.4th 931, 934–35 (10th Cir. 2023) (applying definition of "direct physical loss" under Oklahoma law to the phrase "direct physical loss or damage" under Colorado law)); *see also* [Doc. 48 at 14–15].  Consequently, Plaintiffs argue, and Defendant does not dispute,[4] that the physical damage to the Home and the personal property contained therein claimed by Plaintiffs, if proven, is covered by the Policy.  [Doc. 48 at 14–15; Doc. 58 at 5].

---

[4] Defendant takes issue with Plaintiffs' claim to "damages associated with the investigation of the water origin," arguing that such damages do not constitute a direct physical loss under the Policy.  [Doc. 58 at 5].  Plaintiffs do seek, in their Amended Complaint, "economic damages equal to the amount the Insureds paid out-of-pocket to investigate the cause and origin of the Loss and present their Claim."  [Doc. 25 at 30].  The Court need not address Defendant's argument, however, because although Plaintiffs include in their statement of undisputed facts that they have spent over $1.3 million to date investigating the cause of loss, remediating the water damage, making the necessary repairs, and replacing the affected personal property contents," [Doc. 48 at ¶ 50], the Court does not construe Plaintiffs' request for an entry of partial summary judgment to cover the question of whether the costs of their investigation are covered under the Policy.  *Compare* [Doc. 58 at 5], *with* [Doc. 59 at 4–5 (accepting Amica's agreement with Plaintiffs' construction of "direct physical loss" without mentioning investigation-related damages)]; *see also* [Doc. 48 at 15 (not referencing claimed damages related to the cost of Plaintiffs' investigation)].  To the extent that it seeks a declaration that damages associated with the investigation of the water origin are not covered by the Policy, Defendant may not seek relief through its Response to the Motion for Partial Summary Judgment.  D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").

With the physical damage question resolved, Plaintiffs turn to the potential causes of such damage.  Plaintiffs assert, and Amica agrees, that, if they can prove the damage to the Home and its contents was caused by water overflowing from the cistern or from by water leaking from the in-floor radiant heat or irrigation systems, the Policy's coverage applies.  [Doc. 48 at 16–20; Doc. 58 at 5].

As to the cistern overflow, Plaintiffs explain that because any water that reached the Home from the cistern would have done so via an underground or surface path, the Policy's exclusion for damage caused by surface or subsurface water, *see supra* ¶ 7, applies to the Claim unless it is saved by an exception to the exclusion, [Doc. 48 at 16]. According to Plaintiffs, such an exception applies here.  The Policy states that the surface and subsurface water exclusion does not apply to losses by water that otherwise fall under the Policy's coverage for either (1) "loss caused by mold, fungus or wet rot . . . that results from the accidental discharge or overflow of water . . . from within . . . [a] plumbing . . . system"; or (2) ensuing loss caused by wear and tear, marring, or deterioration, which results in the accidental discharge or overflow of water from a plumbing system.  *Supra* ¶¶ 9–11.  Because all Parties agree that the cistern is part of the Home's plumbing system, *see supra* ¶ 18, and the cistern overflowed because the float switch failed due to wear and tear or deterioration, *supra* ¶¶ 21, 23, 30, 33, Plaintiffs assert that the surface and subsurface water exclusion does not apply here and that the Policy affords coverage for damage to the Home and its contents caused by an overflow of the cistern, which ensued as a result of the worn or faulty float switch, [Doc. 48 at 17–18].  Even though the wear and tear to the float switch itself would not be covered by the Policy, *see supra* ¶¶ 9–10, Plaintiffs contend, the ensuing loss caused by the wear and tear to the float switch is

covered by the Policy. *See, e.g.*, *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1262 (10th Cir. 2020) ("Ensuing loss clauses ensure that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the property insurance policy will remain covered; the uncovered event itself, however, is never covered." (quotation omitted)).

Next, Plaintiffs argue, and Defendant agrees, that if the alleged damage was caused by a leak in the in-floor hydronic heating loops, which are situated inside the Home, the Policy would cover the loss. [Doc. 48 at 19–20]. Unlike water flowing from the cistern, Plaintiffs explain, water from the in-floor radiant heating system would not have flowed underground or over the surface before causing damage and, thus, the surface and subsurface water exclusion does not apply. [*Id.* at 19]. And though the damage might be potentially subject to the wear and tear exclusion, Plaintiffs assert that coverage would be added back pursuant to the exception to that exclusion for ensuing loss caused by wear and tear to a plumbing system. [*Id.* at 20]. And although the subsurface and surface water exclusion would apply to damage caused by a leak in the outdoor irrigation system—given that any water leaking from the irrigation lines would necessarily have flowed underground or over the surface before damaging the Home—Plaintiffs explain that, as with the cistern overflow, coverage would be added back under the exception for ensuing loss caused by wear and tear to the plumbing system. [*Id.*].

Finally, Plaintiffs argue, and Defendant does not dispute, that the Policy's exclusion for damages "[c]aused by vandalism and malicious mischief and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief" does not apply to the facts of this case given that Plaintiffs had not

left the Home "vacant for more than 60 consecutive days immediately before the loss." [Doc. 48 at 20–21; Doc. 58 at 5, 8 (not opposing Plaintiffs' argument that the vandalism exception is not implicated here because the Home had not been vacant for a sufficient amount of time)].  It is undisputed that Plaintiffs left their Home on September 25, 2021, *supra* ¶ 19, and reported the loss to Amica, which then opened the Claim on October 26, 2021, just thirty-one days later, *supra* ¶ 23.   [Doc. 48 at 21].   Accordingly, if Ms. Chambers's actions could be described as "vandalism" or "malicious mischief," Plaintiffs contend, the exclusion is not implicated here.  [*Id.*].

Thus, in all material respects, Defendant agrees with Plaintiffs (1) that the Policy's coverage would apply if Plaintiffs can prove that the House and its contents were damaged by water overflowing from the cistern or leaking from the in-floor radiant heat or irrigation systems, and (2) that the vandalism exclusion is not implicated here.  [Doc. 58 at 5].  Nevertheless, Defendant opposes entry of partial summary judgment in Plaintiffs' favor, arguing that a separate exclusion for intentional loss (the "intentional loss" exclusion) would bar coverage were Amica to prove at trial that Ms. Chambers intentionally caused the alleged damage and was acting as Plaintiffs' agent and within the scope of that agency relationship.  *See* [Doc. 58 at 7–8].  As with Amica's arguments regarding an exclusion for fraudulent conduct discussed in more detail below, however, this affirmative defense based on the intentional loss exclusion is untimely and prejudicial to Plaintiffs.  *See infra* at 20–24.  In any event, Plaintiffs have not sought judgment in their favor with respect to the applicability of the intentional loss exclusion, *see generally* [Doc. 48], and Amica may not seek relief through its Response to the instant Motion to Dismiss,

*see* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").

Accordingly, the Court finds, for the reasons outlined by Plaintiffs in their Motion, that Plaintiffs are entitled to partial summary judgment on the issues of the Policy's coverage raised in their Motion, and concludes that, should Plaintiffs establish at trial that the Home and its contents suffered direct physical damage from water that overflowed the cistern or leaked from the outdoor irrigation lines or in-floor radiant heat system, the Policy covers that damage, notwithstanding the Policy's exclusion for vandalism, which does not apply to the facts of this case.

## II.     Motion to Amend

In its Motion to Amend, Amica seeks to add an affirmative defense based on the Policy's exclusion for fraudulent conduct (the "fraud exclusion"), which states that Defendant "do[es] not provide coverage to an **insured** who, whether before or after a loss, has . . . [i]ntentionally concealed or misrepresented any material fact or circumstance; . . . [e]ngaged in fraudulent conduct; or . . . [m]ade false statements[] relating to this insurance."  [Doc. 61 at 8 (quoting [Doc. 61-9 (emphasis in original)])].

"Federal courts treat insurer claims of policy exclusions as affirmative defenses." *Fought v. UNUM Life Ins. Co. Of Am.*, 379 F.3d 997, 1007 (10th Cir. 2004) (per curiam), *abrogated in part on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008).  "A failure to raise an affirmative defense under Rule 8(c) generally results in a waiver of that defense."  *Adema Techs., Inc. v. Eiffert*, No. 13-cv-01139-CMA-NYW, 2015 WL 5244722, at *2 (D. Colo. Sept. 9, 2015).

It is undisputed that Amica did not assert an affirmative defense of fraud based on Ms. Chambers's alleged conduct in its original Answer to Complaint and Jury Demand ("Answer"), [Doc. 8], or its Answer to Plaintiff's First Amended Complaint and Jury Demand ("Amended Answer"), [Doc. 26]; the Scheduling Order, [Doc. 17]; or at any time before January 23, 2024, when it filed the instant Motion to Amend, [Doc. 61]. The deadline for the amendment of pleadings ran almost a year before Amica filed its Motion to Amend, on February 6, 2023. [Doc. 24]. Contrary to Defendant's sole reliance on Rule 15(a) for its Motion to Amend, [Doc. 61 at 6–7]; *see also* [Doc. 65 at 3–10 (focusing on Rule 15(a) as justification for proposed amendment)], as discussed above, Amica must satisfy the requirements of both Rule 16(b)(4) and Rule 15(a) in order to be granted leave to amend. *See Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1248–1249 (10th Cir. 2015) ("Because [the plaintiffs] knew of the underlying conduct but simply failed to raise their claims, they cannot establish good cause under Rule 16 . . . . As a result, there is no need to consider whether [the plaintiffs] satisfied Rule 15." (cleaned up)).

This Court turns first to whether Amica has established good cause for the amendment of the Scheduling Order. This standard "requires the moving party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay." *Strope v. Collins*, 315 F. App'x 57, 61 (10th Cir. 2009) (quotation omitted). In supporting its Motion to Amend, Defendant relies primarily on the depositions of Ms. Chambers and Bill Cain ("Mr. Cain"), an individual identified by Ms. Chambers to inspect the in-floor radiant heat system, and a judgment against Ms. Chambers in order to establish that "a reasonable jury could easily infer that Ms. Chambers acted intentionally and sabotaged Plaintiffs' house for her own economic

gains" and that the alleged fraudulent actions of Ms. Chambers should be imputed to Plaintiffs because she acted as their agent.   [Doc. 61 at 8–10; Doc. 65 at 2].   These depositions were taken during discovery in this matter, after the deadline for the amendment of pleadings.  *See* [Doc. 61-2; Doc. 61-5].

Although a party may satisfy the good cause requirement under Rule 16 if a plaintiff learns *new* information during discovery, *Gorsuch*, 771 F.3d at 1240 (emphasis added), Amica knew of the basic facts related to Ms. Chambers's actions with respect to the Home at the latest on September 22, 2022, and was aware of her relationship with the Plaintiffs no later than October 29, 2021, [Doc. 1 at ¶ 38; Doc. 61 at 6].  *See, e.g.*, *Birch*, 812 F.3d at 1248–49 ("Because Appellants knew of the underlying conduct but simply failed to raise their claims, they cannot establish good cause under Rule 16."  (cleaned up)); *see also Laurienti v. Am. Alt. Ins. Corp.*, No. 19-cv-01725-DDD-KLM, 2019 WL 6837999, at *5 (D. Colo. Dec. 16, 2019) (denying a motion to amend answer where the defendant knew prior to filing its answer of the potential availability of an affirmative defense it later sought to include), *report and recommendation adopted*, 2020 WL 9424686 (D. Colo. Jan. 6, 2020).

And, to the extent that Amica suggests that the depositions of Ms. Chambers and Mr. Cain changed its interpretation of the basic facts of Ms. Chambers's actions, Defendant took the deposition of Ms. Chambers on May 30, 2023, [Doc. 61-2 at 1], and the deposition of Mr. Cain on June 23, 2023, [Doc. 61-5 at 1].  The judgment against Ms. Chambers was entered on June 16, 2018, [Doc. 61-8 at 1], and appears to have been obtained by Defendant no later than June 20, 2023.  [Doc. 61-8].  Amica concedes that all the "key" depositions concluded no later than June 2023.  [Doc. 65 at 2].  Nowhere in its briefing on the Motion to Amend does Defendant discuss why it waited until January

23, 2024—over seven months after it learned of the facts upon which it bases the affirmative defense of fraud—to seek leave to further amend its Answer.  *See generally* [Doc. 61; Doc. 65].  On Reply, Amica argues that it "did not have the opportunity to fully analyze all of the evidence and decide whether or not to assert the solemn defense of fraud prior to the close of discovery."  [Doc. 65 at 2–3].  But it does not explain why such analysis took another seven months.  *See generally* [*id.*].

Instead, Amica engages in a discussion with respect to an "apparent conflict" between Rules 15 and 16 of the Federal Rules of Civil Procedure.  [*Id.* at 3–4].  In doing so, Amica wholly ignores *Gorsuch* and *Birch*—binding Tenth Circuit precedent.  [*Id.*].  Indeed, not a single case cited by Defendant for the proposition that there is an "apparent conflict" between Rules 15 and 16 of the Federal Rules of Civil Procedure discusses *Gorsuch* or *Birch.*  The *Birch* court unequivocally stated that "[t]wo Federal Rules of Civil Procedure, Rules 15 and 16, govern [a] motion to amend" filed after a scheduling order's deadline has passed, without any mention of an "apparent conflict," *Birch*, 812 F.3d at 1247, and affirmed the district court's finding that a delay of four months from the time of discovery to a motion to amend was unjustified under Rule 16, *id.* at 1247–49.

Amica points to no Supreme Court or en banc Tenth Circuit ruling that would call either *Gorsuch* or *Birch* into question.  *See* [Doc. 65 at 3–4]; *see also Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("A published decision of one panel of this court constitutes binding circuit precedent constraining subsequent panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court.").  The vast majority of cases upon which Defendant relies were decided *before Gorsuch* or are out of Circuit.  [Doc. 65 at 3–4].  And as recently as April 2022, the Tenth Circuit reaffirmed—

in a published decision—that "[a]fter a scheduling order deadline for amending the pleadings has passed . . . 'a party seeking leave to amend must demonstrate (1) good cause for seeking modification under Fed. R. Civ. P. 16(b)(4) and (2) satisfaction of the Rule 15(a) standard.'" *Seale v. Peacock*, 32 F.4th 1011, 1030 (10th Cir. 2022) (quoting *Birch*, 812 F.2d at 1247).[5]

Based on the record before it, this Court concludes that Amica has failed to demonstrate diligence in seeking amendment, which is fatal to its Motion to Amend.[6] *See, e.g.*, *Colo. Visionary Acad.*, 75 F.R.D. at 688 (denying a motion for leave to amend an answer to add an affirmative defense based on evidence gleaned, but not acted on, in discovery, where the defendant waited sixty-two days after filing its amended answer to move to amend).

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

---

[5] This Court reminds counsel that as an officer of this Court and under Rule 11(b) of the Federal Rules of Civil Procedure, by signing a paper submitted to the Court, an attorney certifies that "the claims, defenses, and other legal contentions are warranted by existing law or *by a nonfrivolous argument* for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2) (emphasis added).

[6] Furthermore, even if it were to consider whether Defendant could satisfy Rule 15's more lenient standard, this Court would conclude that Amica's Motion to Amend is not only unduly delayed but prejudicial to Plaintiffs. *See Frank*, 3 F.3d at 1365. As Defendant explains, were this new fraud defense to be proven at trial, it would act as a complete bar to Plaintiffs' recovery under the Policy. *See* [Doc. 61 at 7–8; Doc. 65 at 5]. Thus, by waiting to seek amendment, Defendant has prejudiced Plaintiffs by depriving them of the ability to: (1) develop facts through discovery that might undermine Defendant's affirmative defense of fraud; (2) bring additional causes of action that now might be barred by the statute of limitations; and (3) seek relief as to the affirmative defense through pretrial motions. Plaintiffs advised Amica of the underlying leak on or about October 25, 2021, and Amica opened its claim with respect to the loss that same day. [Doc. 25 at ¶¶ 34–35]. Plaintiffs filed suit on September 22, 2022. [Doc. 1]. Allowing Amica to further amend its Answer at this eleventh hour would, in effect, restart this litigation from the beginning and prejudice Plaintiffs by further delaying the resolution of this matter.

(1)   Plaintiffs' Motion for Partial Summary Judgment RE: Coverage [Doc. 48] is **GRANTED**;

(2)   Defendant's Motion for Leave to Amend Answer to Add Affirmative Defense [Doc. 61] is **DENIED**; and

(3)   A Telephonic Status Conference is **SET** for **April 2, 2024, at 10:00 AM** before Judge Nina Y. Wang at which the undersigned will set a Final Pretrial Conference/Trial Preparation Conference and date for trial.  Counsel for the Parties shall participate using the following dial-in information: 888-363-4749; Access Code:  5738976#.

DATED:  March 7, 2024                          BY THE COURT:

                                                          Nina Y. Wang
                                                          United States District Judge